IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Edward M. Aydt and           Case No. 20-20738
    Jody S. Aydt,

               Debtors.        Chapter 7

---

    Patrick S. Layng,
    United States Trustee,

               Plaintiff,        Adversary No. 20-02103-beh

v.

    Edward M. Aydt,

               Defendant.

---

## DECISION

---

In late 2016, debtor Edward Aydt joined a money-making venture that soon went south. To be exact, the venture went east. The enterprise, run by Aydt's acquaintance Albert Golant, entailed buying luxury vehicles in the United States and selling them overseas—primarily in China—at much higher prices. Unbeknownst to Aydt, Golant's business was a Ponzi scheme. The scheme was exposed in mid-2017, Golant disappeared, and Aydt was left to answer for over $1.5 million in investment loans he had procured on behalf of Golant. Aydt and his wife eventually filed for bankruptcy protection seeking to discharge this substantial debt.

The United States Trustee ("UST") concedes that Aydt may be a victim of Golant's fraud, but counters that he is not an innocent victim. Based on multiple misstatements and omissions in his bankruptcy schedules and statements, plus Aydt's inability to account for the whereabouts of the $1.5 million in investment proceeds, the UST seeks to deny Aydt's discharge on three different grounds: (1) under 11 U.S.C. § 727(a)(4)(A), for making false

oaths in connection with the bankruptcy case; (2) under § 727(a)(5), for failing to explain adequately the loss of the $1.5 million loan proceeds; and (3) under § 727(a)(3), for failing to keep or preserve adequate records of the disposition of the loan proceeds.[1] For the reasons that follow, the Court will grant the UST's request in part (as to § 727(a)(4)(A)), and deny the request in part (as to §§ 727(a)(5) and (a)(3)).

**JURISDICTION**

The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). This decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

**BACKGROUND**

Debtor Edward Aydt is a high school graduate and one semester short of an undergraduate degree in English. Since January 2018, Aydt has worked as a licensed real estate broker, and recently also became general manager of a remodeling company. Before that (until October or November 2016), he was employed at luxury car dealer Fields Auto Group. During his 25-year employment at Fields, Aydt worked in various roles, including in sales, marketing, administration, and management.

**A.      Aydt's Involvement with Albert Golant**

In the fall of 2016, Aydt was approached by Albert "Alex" Golant with a potential business opportunity. Aydt had met Golant through his employment at Fields, where Golant had conducted business for several years in connection with a vehicle leasing company he owned and operated. The potential opportunity that Golant presented involved another of Golant's businesses, WI Automotive Trust, LLC.[2]

---

[1] The UST also named Mrs. Jody Aydt as a defendant in the proceeding, but later moved to dismiss the complaint as to Mrs. Aydt.

[2] The full entity name registered with the Wisconsin Department of Financial Institutions is WI Automotive T.R.U.S.T., Lease, Registration, and Consulting LLC.

As described to Aydt, WI Automotive Trust made a profit by "leveraging sufficiencies in supply and demand in the luxury vehicle market on a global scale"—in other words, buying luxury vehicles in the United States and shipping and selling them overseas at much higher prices. Aydt's role in this venture, as Golant described, would be to find an investor willing to provide the capital needed to buy the vehicles to be sold overseas; in return, Aydt would receive one-third of the profits from sales funded by that investor. In light of this opportunity, as well as changes in the automotive environment that had limited his income, Aydt left his full-time employment at Fields Auto Group to partner with Golant.[3]

## B.    The F Street Investment Promissory Notes

To fulfill his end of the deal with Golant, Aydt contacted Scott Lurie, another person whom he had met while working in sales at Fields Auto. Lurie was the principal of a lending company doing business as F Street Investments LLC. In September 2016, F Street agreed to participate in the luxury car export venture by providing financing.

Between September 2016 and January 2017, F Street invested between $3 million and $4.5 million into the project, executing at least four promissory notes with Aydt and Golant, including (1) an October 1, 2016 note for $1 million; (2) a December 1, 2016 note for $1.5 million; and (3) a January 1, 2017 note for $1.5 million.[4] Aydt signed each of these F Street notes in his individual capacity, jointly and severally liable with Golant. Although each F

---

[3] In various correspondence introduced at trial, Aydt sometimes referred to himself as Golant's "partner"; he testified, however, that he had used the term loosely and wouldn't characterize his relationship with Golant as a legal partnership, nor was he a formal partner or member of WI Automotive Trust.

[4] *See* ECF No. 29-9 (UST Ex. 9), at 9–15. The record is unclear as to the amount and date of the fourth note. Aydt suggested that a fourth note was signed on November 1, 2016, *see id.* at 5, but there is no direct evidence of any such investment or corresponding promissory note in the record. The UST's adversary complaint, on the other hand, includes as an exhibit a September 2, 2016 promissory note for $500,000, signed by Golant. ECF No. 29-14 (UST Ex. 14), at 23–24. In addition, Mr. Lurie testified that the $1.5 million promissory note signed on January 1, 2017 did not necessarily represent "new money," but could have simply been a reaffirmation of the amount of debt outstanding on the prior promissory notes.

Street note identifies Aydt (as well as Golant) as a "Payor" and states that the promise to repay is in consideration "for value received," Aydt testified that he never received any loan proceeds directly from Lurie or F Street. Instead, the funds from F Street were wired to an account at MB Financial Bank, held in the name of WI Automotive Trust, LLC, to which Aydt never had access. Lurie did not dispute that description of the funds' conveyance.

## C.    Records Related to F Street's Investment

Aydt described himself as an "intermediary" between Golant and Lurie. It was Aydt who sent Lurie the information necessary to wire the loan proceeds to WI Automotive Trust's account at MB Financial Bank and Aydt who communicated with Lurie about the cash flow needs of the car export business. Aydt also was responsible for providing Lurie with information related to the use and disposition of the F Street loan proceeds. This information included documentation that Aydt received via email from Golant, such as copies of purchase orders for vehicles and proof of payment for those vehicles, purportedly showing sales made using the F Street loans. Aydt maintained a "cash flow summary" spreadsheet—which Aydt described as a "fluid collaborative document that many people had access to" in the cloud— containing information from those documents (contract date, purchase price, make, model, and VIN) and provided Lurie access to the same through Google Sheets. *See* ECF No. 29-7 (UST Ex. 7), at 6, 182–90; UST Ex. 9, at 43, 70.

At the beginning of Aydt and Golant's business venture, in September 2016, Golant was fairly prompt in providing Aydt supporting documentation for deals purportedly associated with F Street's investment. But only four to five weeks later, by the end of October 2016, this information had dried up. On October 28, Aydt expressed his frustration to Golant via email:

> Alex,
>
> Scott and I have a fiduciary agreement that if I'm not comfortable, he's not comfortable. Right now, I'm not comfortable. I have a couple concerns that need to be addressed prior to Scott's money coming back into play on 11/1 or requesting additional money from him.

> I made a commitment to Scott to provide him with regularly
> updated information relative to the whereabouts of his money. You
> have provided me nothing for the month of October despite
> repeated requests.
>
>  . . . You've told me several times that you're going to provide me
> with a detailed accounting of the deals to-date reflecting my return.
> I have received nothing including any kind of related
> compensation.

ECF No. 29-8 (UST Ex. 8), at 197. In the same email, Aydt listed his own

"requirements for the monthly return of capital," insisting that Golant (1) send

him a "detailed spreadsheet recap of deals and supporting docs (PO's, proof of

payment, etc[.])" every week, and (2) pay him compensation monthly, with "[a]

check on the last day of the month reflecting yield on prior month's deals." *Id.*

Thereafter, Golant sporadically gave Aydt information regarding the use

of F Street's investment funds, which Aydt used to update his cash flow

spreadsheet. The latest transaction reflected on the spreadsheets that Aydt

produced to the UST is dated January 2, 2017, *see* UST Ex. 7, at 185–87,[5]

although Aydt testified that, to the best of his recollection, he kept records after

January 2, 2017.

Golant also started paying Aydt at least some of his promised

compensation. On November 4, 2016, Aydt received a wire transfer of $16,800

from MB Financial Bank, by order of WI Automotive Trust, LLC, sent to his

personal checking account at Chase Bank (Chase Account *0549). ECF No. 29-

12 (UST Ex. 12), at 31, 415; *see* also UST Ex. 7 at 68 (reflecting that the wire

transfer contained the reference message "sept commission").

---

[5] Aydt explained: "[T]his is a fluid spreadsheet located in the cloud. . . . I don't know for a fact
that this did not populate with additional information beyond January of 2017. This happened
to be one that was downloaded and saved in a static form from a fluid spreadsheet. . . . The one
we're looking at right now is a snapshot of what happened up until January 2nd of 2017. It's
not a snapshot of anything that happened beyond that." If the UST obtained any more recent
spreadsheets "in static form" via his discovery requests of F Street/Mr. Lurie, they were not
offered into evidence.

**D.      Aydt's 2017 Income from Golant Affiliates**

Aydt received at least an additional $47,000 from Golant in 2017, as income for his role in the car export venture (income Aydt described as "draw[s] against commission in exchange for sourcing investment capital from F Street Investments"). These "draws" consisted of four transactions between February 16 and April 25, 2017:

- On February 16, 2017, $10,000 was deposited into Chase Account *0549 from Reliable Car Source (an entity affiliated with Golant), *see* UST Ex. 7, at 3, 16; UST Ex. 12, at 48;[6]

- On March 30, 2017, $10,000 was deposited into Chase Account *0549 from Reliable Car Source, *see* UST Ex. 7, at 3, 18; UST Ex. 12, at 79, 85;

- On April 4, 2017, $8,000 was deposited into Chase Account *0549 from Shha LLC (an entity affiliated with Golant), *see* UST Ex. 7, at 3, 18; UST Ex. 12, at 79; and

- On April 25, 2017, $19,000 was transferred via wire into an account at Securant Bank (Securant Account *785) held by River Birch Capital, LLC (*see infra* Section E), from Reliable Car Source, *see* UST Ex. 7, at 5, 17; ECF No. 29-13 (UST Ex. 13), at 2.[7]

In addition to the above payouts, Reliable Car Source deposited $22,000 in Aydt's Chase Account *0549 on January 26, 2017. UST Ex. 12, at 48. According to Aydt, this payment was unrelated to his business venture with Golant. Instead, the $22,000 deposit was a refund of prepayments he made on a lease for a 2016 Land Rover Range Rover with Phil Tolkan Leasing, which Aydt exited early. Phil Tolkan Leasing then sold the vehicle to Reliable Car Source. When asked at trial why the payment came from Reliable Car Source and not Phil Tolkan Leasing, Aydt answered indirectly: "[T]hey had an

---

[6] In post-trial briefing, the debtor asserts that "[t]his was the first payment from Golant since he approached Aydt with his proposal." According to the record, however, including Aydt's testimony at trial, the first payment Aydt received from Golant was the November 2016 wire transfer of $16,800 noted above.

[7] In responding to the UST's discovery interrogatories, Aydt originally stated that his commissions also included $10,000 deposited into Chase Account No. *0549 from an unknown cash source on June 7, 2017; he later amended his response to identify that the funds came from a 401k withdrawal, rather than Golant. *See* UST Ex. 7, at 3, 9–11.

interested party that wanted the car. I wanted out of it. I had already paid the lease ahead of time, and the $22,000 was payment for, you know, the portion of the term of the lease that I did not have the vehicle. I don't know how to explain it other than that."

**E.    Creation of River Birch Capital, LLC**

By late March 2017, Golant and Aydt had not yet repaid the now-overdue January 1 $1.5 million promissory note to F Street, and Aydt was dissatisfied with how Golant was handling (and documenting) the loan proceeds. Anticipating that Golant would satisfy the January 1 note and that F Street would reissue new funds on May 1, 2017, Aydt organized River Birch Capital, LLC, on March 29, 2017, with himself as sole member. He opened a business account for the LLC at Securant Bank & Trust (now First Citizens Bank) (Securant Account *785). The purpose of the account was to hold the next round of investment funds to be issued by F Street, so that Aydt would have direct oversight of the money.

May 1, 2017 came and went. The January 1 note remained unpaid, and F Street did not issue any new investment funds. According to Aydt, May 1 was the day that Golant "disappeared." Eventually (in 2018), Golant was arrested, indicted, and pled guilty to wire fraud and conspiracy to commit tax fraud in connection with his luxury car export business, which was in fact a sophisticated Ponzi scheme.[8] Golant was sentenced to prison and ordered to pay over $20 million in restitution to various parties, including F Street.

After Golant's disappearance, Aydt kept River Birch Capital, LLC, and its bank account, but repurposed the entity to serve as a holding company for future commissions, for tax purposes. Aydt closed the LLC's account at

---

[8] In the federal indictment, of which the Court can take judicial notice, *see* Fed. R. Evid. 201, the United States alleged that Golant was engaged in a long-term fraud scheme, in which he obtained funds from third parties (over $30 million from at least 40 different victims) by representing that the funds would be used to purchase specific luxury vehicles for export. In some instances, Golant never purchased the vehicle but kept the funds; in others, he purported to sell the same luxury vehicle to multiple clients at the same time; and in still others, he obtained funds for the purchase of luxury vehicles he knew already had been sold and exported. *See* Case No. 18-CR-144-PP, ECF No. 7 (E.D. Wis. June 26, 2018).

Securant Bank in February 2018, and that same day opened an account for the LLC at Chase Bank (Chase Account *9375). River Birch Capital, LLC, administratively dissolved in March 2020. Aydt received notice of the impending dissolution on January 13, 2020.

**F.    Robert Aydt's Investment and Edward Aydt's Recovery of a Range Rover**

Going back to early 2017, Aydt and Golant apparently were experiencing cash flow problems stemming from the requirement to return capital to F Street at the end of each month. Aydt approached his brother, Robert Aydt, and explained the dilemma. As Robert testified at trial: "[T]hey felt like at the end of the month that there were better opportunities to purchase vehicles, better discounts, whatever, and so essentially the long and short of it, they had a cash-flow issue and felt there was an opportunity if they had more funding." To help out, Robert agreed to buy two vehicles in January and February of 2017, with the understanding that Golant would sell the vehicles and then repay Robert. Robert fulfilled his commitment by funding the purchases of a Range Rover and a Mercedes, both of which he financed through Bank of America, and turned over the vehicles to Golant. Golant, on the other hand, failed to follow through and never repaid Robert (or returned the vehicles to Robert), leaving the latter liable for a substantial debt to Bank of America.

After Golant disappeared in May 2017, Aydt attempted to recover vehicles that Golant purportedly had bought using F Street's investment, as well as the vehicles his brother Robert had financed.[9] Given the nature of Golant's scheme, disputes arose between investors about the funding used to buy certain vehicles, and therefore the right to any sale proceeds should the

---

[9] Although not explained at trial, for clarity of narrative the Court notes that transcripts of Aydt's prior testimony, which were admitted as exhibits at trial, provide additional context for Aydt's statements about his "recovery" efforts: after learning from Lurie and Lurie's counsel that Golant had shipped vehicles to several different warehouses in California, Aydt traveled there and, with the assistance of private investigators, tried to locate and recover specific vehicles to which Lurie had staked a claim. To the extent Aydt's prior testimony constitutes hearsay, the Court does not consider it for its truth, nor rely on the testimony in rendering this decision.

vehicles be recovered and sold. Such a dispute apparently arose between Robert and F Street after Aydt located and retrieved (or was in the process of retrieving) two vehicles. In July 2017, Robert and Aydt entered into an agreement "with respect to the disposition of certain vehicles and indemnification of certain liabilities." ECF No. 29-10 (UST Ex. 10), at 1–5. According to the agreement, "F Street lent One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) to [Edward Aydt] and Alex Golant . . . and is claiming that said loan proceeds were used to purchase the Vehicles"—with "Vehicles" defined in the agreement to mean the Range Rover that Robert financed and a 2017 Mercedes GLS (not the Mercedes Robert financed, but another vehicle referred to as the "Penn Vehicle")—"and therefore F Street is entitled to the Sale Proceeds"—with "Sale Proceeds" meaning "the sale price of each Vehicle." *Id.* at 1–2. The agreement provided that Robert would "cooperate in selling the Range Rover and the Penn Vehicle,[10] release any claim to the Sale Proceeds and consent to the payment of the Sale Proceeds to F Street to reduce the balance due under the F Street Debt." *Id.* In exchange, Aydt would assume Robert's debt to Bank of America, which then was approximately $160,000. *Id.* To secure this indemnification obligation, Aydt gave Robert a junior mortgage on his home, which was recorded on July 28, 2017.

At trial, Robert explained that the goal of the agreement was for Aydt to obtain liquid funds through the sale of (other) recovered vehicles to pay off Robert's Bank of America obligations, adding:

> Assuming the cars are recovered, I'm paid and then I then have the ability to pay off my debt to Bank of America . . . .

> [Aydt] has a debt to me for the amount indicated. I owe a debt to the bank just separate. How he pays me back, I don't care. How he recovers and what cars he recovered or was able to recover, it doesn't matter to me. That's of no consequence and none of my business actually. I just need to be paid so that I can satisfy my debt with Bank of America and that was the spirit and intent of the agreement . . . .

---

[10] The record does not explain whether or how Robert had any interest in, or relationship to, the Penn Vehicle.

Aside from the few cars Aydt retrieved on behalf of F Street, he also was able to recover one other vehicle: a 2017 Range Rover in the same make and model as the one Robert financed (but with a different VIN). The Range Rover was titled in the name of a straw buyer who did not actually pay for the car, and she gave Aydt power of attorney to sell the vehicle. Aydt sold the car on August 30, 2017 for approximately $106,000. *See* UST Ex. 7, at 172–81. The purchase price was paid in two installments: a first payment of $54,955.23, which Aydt deposited in his home equity loan account at Securant Bank (Securant Account *284) on September 1, 2017; and a second payment of $51,625.77, which Aydt deposited into the same account on February 22, 2018. *See* UST Ex. 13, at 50, 68. Aydt subsequently withdrew and used those vehicle sale proceeds to pay his personal expenses.

During trial and in briefing, Aydt took the position that the $106,000 in proceeds from the sale of the Range Rover was the consideration for the mortgage he gave Robert on his home. *See* ECF No. 40, at 35 ("Q: Should [the funds] have gone to your brother instead? A: Well, I mean yes and no. However, he took out a two-hundred-thousand-dollar mortgage against my home in exchange for the consideration."); ECF No. 48, at 7 ("Instead of taking the money himself, Robert took out a second mortgage secured by Aydt's home . . . with the sale proceeds supporting the mortgage."). This position, however, appears inconsistent with the underlying agreement between Aydt and Robert, which, as explained above, specifies the consideration exchanged between the parties.[11]

## G.    The F Street Lawsuit

In 2018, the successor to F Street Investments, Universal Credit Advisors, LLC, sued Aydt (and Golant) for recovery of the January 2017

---

[11] For the same reason, the debtor's post-trial assertion that "Robert Aydt's debt is listed as disputed in Aydt's schedules because the mortgage is for more than the money that was actually exchanged" also is incorrect. Setting aside the fact that Aydt does *not* list the debt owed to Robert as disputed on Schedule D, *see* ECF No. 29-1 (UST Ex. 1), at 22 (disclosing a secured debt of $200,000 owed to Robert, incurred in July 2017), the $106,000 in sale proceeds is not identified in the parties' agreement as the basis for Robert's claim or mortgage.

promissory note, commencing Milwaukee County Circuit Court Case Number 2018CV000210. That litigation was stayed when Aydt filed for bankruptcy.

## H.     The Bankruptcy Filing

### 1.     The Initial Schedules and Statements

On January 30, 2020, Aydt and his wife filed a joint Chapter 13 bankruptcy petition along with the required schedules and statements, which they signed under penalty of perjury. UST Ex. 1, at 6, 39, 46.

#### a.     Bank accounts

On Schedule A/B, when asked to describe their financial accounts, the Aydts disclosed what appear to be three bank accounts: (1) a Chase checking account and (2) a Chase savings account ("checking, savings" at Chase Bank) with a combined total balance of $2,500; and (3) a BMO Harris checking account.[12] *Id.* at 13. As of the petition date, however, Aydt and his wife did not have a savings account at Chase Bank; instead, they had two checking accounts at Chase: a personal joint checking account (Chase Account *4814), and Aydt's business checking account for River Birch Capital, LLC (Chase Account *9375).

At trial, Aydt testified that he did not know why Schedule A/B disclosed a savings account. He stated that his bankruptcy attorney, Jeffrey Reitz, prepared the schedules after asking Aydt (and his wife, separately) a series of questions, and Aydt did not recall telling Reitz that he had a savings account ("So I said I have checking—a checking—checking accounts at Chase. He didn't ask me how many or what the account numbers were or anything of that nature."). Aydt also did not look specifically at this particular portion of Schedule A/B before he signed and filed the document, explaining: "There's a certain reliance I have on my attorney."

---

[12] The BMO Harris account belongs solely to Mrs. Aydt, and reportedly had a balance of $500 as of the petition date. In their Schedule C, the Aydts claimed all three depository accounts as exempt under Wis. Stat. § 815.18(3)(k), which allows an individual debtor to claim as exempt "[d]epository accounts in the aggregate value of $5,000, but only to the extent that the account is for the debtor's personal use and is not used as a business account." *See* UST Ex. 1, at 19.

As for the number of Chase checking accounts disclosed—and, specifically, whether the disclosure included not only his personal joint checking account, but also the River Birch Capital, LLC, account—Aydt suggested that "checking" could be interpreted as identifying more than one account, *i.e.*, both the personal checking and the LLC business checking account ("it depends on how you interpret it").[13] Even accepting Aydt's reading of Schedule A/B as disclosing the existence of the River Birch Capital checking account, however, the evidence of record shows that the disclosure of the *amount* held in both the personal and business accounts cannot be accurate: the River Birch Capital checking account alone held a balance of $2,997.79 as of January 29, 2020, and $2,863.41 as of January 31, 2020, both of which exceed the total scheduled value of $2,500 in the petition filed on January 30. *See* UST Ex. 12, at 559.[14]

On the Statement of Financial Affairs ("SOFA"), Aydt disclosed that no financial accounts or instruments held in his name or for his benefit were closed, sold, moved, or transferred within a year of the petition date. UST Ex. 1, at 44 (SOFA question 20). But two such accounts existed: (1) Edward M. Aydt and Jody S. Larson Chase Checking Account *0549 (closed in October 2019) and (2) Edward M. Aydt and Jody S. Larson Chase Savings Account *3898 (closed in October 2019).[15]

### b.    River Birch Capital, LLC

On Schedule A/B, Aydt disclosed no interest in any businesses, LLCs, or partnerships. UST Ex. 1, at 13. Similarly, he disclosed on the SOFA that he did

---

[13] Mr. Reitz's testimony lends some support to this reading: Reitz testified that his usual practice when disclosing bank accounts on Schedule A/B is to write the types of accounts and the institution, not necessarily every account number, and to list multiple accounts at the same institution together, with "the grand total for all accounts being indicated."

[14] Neither party submitted any evidence to establish the amount of the balance in Chase Account *4814 as of the petition date.

[15] The debtors had commenced or were continuing an action for dissolution of their marriage, at least within 12 months after they filed their joint bankruptcy petition. *See* Case No. 20-20738, ECF No. 56.

not own any business or have any connections to any businesses within four years before the petition date *Id.* at 45 (SOFA question 27).

Aydt testified that he did not know why his business, River Birch Capital, LLC, was not disclosed, stating that he informed Mr. Reitz about the existence of the LLC before he filed his petition ("[W]hy it's not properly disclosed, I cannot explain. It would have to be taken up with Mr. Reitz."). Mr. Reitz corroborated Aydt's testimony. Reitz explained that, in reviewing his file prior to trial, he noticed that he had made a notation on his client questionnaire indicating that Aydt had an LLC ("he said he had an LLC with about a thousand dollars in the bank"), and Reitz apparently missed that note when filling out the schedules and SOFA ("I think I just kind of spaced on it. So that would be on me.").

### c. Income

On the SOFA, the Aydts disclosed their total gross income from employment or operating a business as follows:

- In 2019, Mr. Aydt received $51,000 in employment income ("wages, commissions, bonuses, tips") and Mrs. Aydt received $18,077 in employment income, for a total of $69,077. No business income (income from "operating a business") was reported.

- In 2018, Mr. Aydt received $7,090 in employment income and Mrs. Aydt received $15,002 in employment income, for a total of $22,092. No business income was reported.

- In 2017, Mr. Aydt received $14,771 in employment income and Mrs. Aydt received $14,610 in employment income, for a total of $29,381. No business income was reported.

UST Ex. 1, at 40 (SOFA question 4).[16]

The gross income Mr. Aydt disclosed for 2017—$14,771—is much less than the $47,000 in commission or draw he later testified to receiving from

---

[16] SOFA question 4 asks: "Did you have any income from employment or from operating a business during this year or the two previous calendar years?" Because the Aydts filed their joint petition on January 30, 2020, the appropriate response would have been to disclose their income from January 1, 2020 through January 30, 2020; for calendar year 2019; and for calendar year 2018. Instead, the Aydts answered the question by disclosing their income for calendar years 2019, 2018, and 2017.

Golant that year. Aydt attributes this discrepancy in part to an error by his accountant, as well as his reliance on bankruptcy counsel in disclosing his business income. According to Aydt's testimony, which is corroborated by supporting documentation, when he was preparing his 2017 tax returns, he informed his accountant that he received $47,000 in business income from his work with Golant. *See* UST Ex. 7, at 12–15. That amount, however, is not the number that is reported as "gross receipts" or "gross profit" on Schedule C of Aydt's 2017 federal tax returns. *See* ECF No. 29-6 (UST Ex. 6), at 5.[17] Instead, Schedule C reports Aydt's gross income from River Birch Capital as $28,000 (which apparently excludes the $19,000 transferred into River Birch Capital's Securant account on April 25, 2017). *Id.* Aydt testified that he was not aware of this discrepancy when he filed his 2017 tax return, or his petition. Schedule C then reports Aydt's "net income," after deducting expenses totaling $16,778 from the (incorrect) gross income figure of $28,000, as $11,222. *Id.*

Aydt used this "net profit" number of $11,222—rather than his tax-reported gross income of $28,000, or his *actual* gross income of $47,000—in calculating the $14,771 of gross income he disclosed on his SOFA.[18] He did so on the advice of his bankruptcy counsel. At trial, Reitz explained why he advises clients to use a net amount, rather than a gross amount, in reporting their gross income: "Basically that is what would be available. First of all, it's what's going to be taxable but secondly, that would be available for payment of personal expenses and depending on the chapter possibly for the creditors also. That's where those funds are going to be coming from is that net amount."

---

[17] Schedule C, which is titled "Profit or Loss from Business (Sole Proprietorship)" names Aydt as the proprietor of River Birch Capital and describes the "principal business or profession" of the proprietorship as "Vehicle Sales."

[18] The additional $3,549 in income Aydt received in 2017 appears to be attributable to some other source of employment. In his 2017 joint state tax returns, Schedule 2 (Married Couple Credit When Both Spouses Are Employed), Aydt reported his net business income from Golant, as well as employment income for both himself and his wife, as follows: Mr. Aydt received "net profit (or loss) from self-employment from federal Schedule[] C . . . and any other taxable self-employment or earned income" of $11,222, and "[t]axable wages, salaries, tips, and other employee compensation" of $3,549; Mrs. Aydt received "[t]axable wages, salaries, tips, and other employee compensation" of $14,610. *Id.* at 19.

In response to question 5 of the SOFA, Aydt disclosed that he did not receive any "other income" during the two calendar years prior to filing. UST Ex. 1, at 41. In doing so, Aydt omitted the February 2018 proceeds ($51,625.77) from the sale of the vehicle he recovered in California. At trial, Aydt's explanation for this non-disclosure was "because the money that I received was essentially a loan in exchange for a lien on my home." The record is unclear as to whether Aydt informed Reitz of the sale of this particular vehicle, or his subsequent receipt of the proceeds, prior to filing his bankruptcy petition. *See* ECF No. 40, at 134–35 (testimony of Mr. Reitz) ("Q: Did Mr. Aydt tell you about the fact that he sold a vehicle and received money for the sale of that vehicle in 2017 and 2018? A: We discussed some vehicle sales, and other than the one from Phil Tolkan that was given back in exchange for the release,[19] at that time, Mr. Aydt thought that we were looking at transactions that were prior to two years in advance of the filing of the petition. So there were some discussions but they were not disclosed because we didn't think that they were within the two years. Q: What car are you talking about? A: There were always Land Rovers so I don't know which specific one.").

d.      **Vehicle transfers**

In response to question 18 of the SOFA, Aydt disclosed that he did not sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of business or financial affairs, within two years of the petition date. *Id.* at 44. As noted *infra* in Section H.3, this disclosure omitted Aydt's sale of two 1997 Range Rovers in 2018. These vehicle sales were not disclosed on his January 30, 2020, SOFA because Aydt initially did not think the sales had occurred within the prior two years.

2.      **The meeting of creditors and request for amendments**

On April 17, 2020, the Aydts converted their case to Chapter 7. They appeared before the Chapter 7 trustee for their 11 U.S.C. § 341 meeting of creditors on May 27, 2020. At that meeting, the trustee pointed out several

---

[19] *See infra* Section H.3.

omissions in the debtors' schedules and statements and requested that they file amendments to disclose four items: (1) a contingent personal injury claim held by Mrs. Aydt; (2) Mr. Aydt's contingent commission on a prepetition real estate listing contract; (3) a leased vehicle; and (4) vehicles sold within two years of the petition date. ECF No. 29-2 (UST Ex. 2), at 8. During the meeting, Mr. Aydt also disclosed that he had operated a business (River Birch Capital, LLC) within the past two years, but the trustee did not ask Aydt to amend his schedules or statements to include that particular disclosure. *Id.* at 5.

### 3. The U.S. Trustee's Rule 2004 examination

On May 20, 2020, the Court granted the UST's motion to examine the debtors under Bankruptcy Rule 2004 and entered an order compelling them to produce certain documents and appear for an examination. ECF No. 29-16 (UST Ex. 16). The Court's order required the debtors to produce, among other things:

> A detailed accounting sufficient to trace the receipt and disposition of all loan proceeds issued from F-Street Investments LLC to Edward Aydt and or Jody Aydt from January 1, 2016 through January 1, 2018. The accounting shall include all necessary documents to substantiate the accounting, to include all supporting bank records, bank statements, canceled check images, wire records, receipts, bills of sale, financing records, vehicle titles, vehicle appraisals, sales contracts, purchase invoices, and or export records.

UST Ex. 16 at ¶ 2(b).[20] On May 28, Aydt replied, through bankruptcy counsel: "There are none of these items. Mr. Golant had control of all bank accounts and received all funds from the loan proceeds. Golant was in charge of the information requested." ECF No. 29-17 (UST Ex. 17). At trial, Aydt testified that he did not produce any such documents because he did not receive the loan proceeds directly and had no involvement with the disposal of the money. He

---

[20] In the state court lawsuit filed by Universal Credit Advisors, LLC against Aydt, Universal Credit made a similar discovery request, asking Aydt to "[p]roduce any and al[l] documents which evidence in any way the deposit, use, expenditure of the $1,500,000 you received from the Plaintiff, including but not limited [to] bank statements, cancelled checks, invoices, breakdown sheets, accounting ledgers, correspondence maintained by you or your representatives." Aydt replied, in August 2018: "I have none available." UST Ex. 9, at 8.

did, however, have in his possession at that time various purchase invoices, vehicle titles, vehicle sales contracts, and cash flow spreadsheets, which he ultimately produced months later in discovery in connection with this adversary proceeding.

The Rule 2004 order also required the Aydts to produce "[a] complete list of all vehicles titled in the name of Edward Aydt and or Jody Aydt from January 1, 2017 to April 30, 2020." UST Ex. 16 at ¶ 2(c). In response, Aydt produced a list disclosing that (1) in March 2017, he sold a 1997 Land Rover Defender 90 VIN ending VA104220 (purchased in August 2016 for $47,300) to a third-party individual for $45,000; (2) in September 2018, he sold a 1997 Land Rover Defender VIN ending VA101500 (purchased in October 2015 for $25,000) to Phil Tolkan Leasing for the satisfaction of defaulted lease debts; and (3) in October 2018, he sold a 1997 Land Rover Defender VIN ending VA124587 (purchased in November 2015 for $35,000) to Triangle Auto Sales for $40,000. UST Ex. 8, at 1.

A third category of documents required by the Rule 2004 order was "[c]opies of all bank records from January 1, 2017 to March 1, 2020 for accounts held personally [by] Edward Aydt and or Jody Aydt, and for accounts which Edward Aydt and or Jody Aydt had signatory authority or were named account holders, including business or partnership accounts." UST Ex. 16, at ¶ 2(g). The debtors provided bank statements for the following bank accounts:

- Edward M. Aydt and Jody S. Larson Chase Checking Account *0549 (closed in October 2019);
- Edward M. Aydt and Jody S. Larson Chase Savings Account *3898 (closed in October 2019);
- Edward M. Aydt and Jody S. Larson Chase Checking Account *4814;
- River Birch Capital, LLC, Chase Checking Account *9375; and
- Jody Aydt BMO Checking Account *9729.

Aydt did not produce any records from the River Birch Capital, LLC, account at Securant Bank (open from March 2017 through February 2018) or his home equity loan account at Securant Bank.

Aydt provided testimony under oath at the Rule 2004 examination conducted on June 11, 2020 and continued on July 10, 2020. During that examination, when asked how much he received in total as compensation from his partnership with Golant, Aydt testified that he received $15,000, which was paid in 2017. ECF No. 29-4 (UST Ex. 4), at 9–10.[21]

At trial, Aydt admitted that his testimony at the Rule 2004 examination that he received only $15,000 from Golant was false. He attributed his prior testimony to inaccurate recollection: "Clearly, that answer was incorrect, but the actual amount was disclosed prior on my tax returns and my schedules. I can only tell you honestly that I was wrong, my recollection was wrong and— but it was substantiated, the facts were substantiated by information that I provided to you prior to this question being posed to me." In post-trial briefing, Aydt pointed out that his prior testimony directed the UST to his 2017 tax returns, on which his (mistaken) belief apparently was based.

### 4. Amended Schedules and SOFA

On February 5, 2021 (more than six months after the UST filed his complaint), the debtors filed an amended Schedule A/B and an amended SOFA to make the additional disclosures requested by the Chapter 7 trustee at the

---

[21] The specific line of questioning was as follows:

Q: Okay. Have you received any other profits or remuneration from your relationship with Mr. Golant? At one point did you receive any money from your work with him? / A: He paid me a total, which was explained on my income taxes, a total of—I believe it was $15,000 he gave me basically just to appease me and keep at arm's length about, you know, the rest of this money that he owed me.

Q: And when did he pay you $15,000? / A: I would have to research that.

Q: Did you deposit the 15,000 into one of your bank accounts? / A: Yes. It's all in my [tax] returns.

. . .

Q: . . . [D]o you have a copy of the check that he provided to you? / A: I don't know. I mean, I would have to go back and figure out when it was deposited and come up with the deposit slip. But it's all in my tax returns [for 2017].

. . .

Q: Okay. And what was the reason that he paid you the 15,000? / A: It was basically a draw against the massive amount of money that he owed me. According to our agreement.

. . .

Q: So in all, you received $15,000 in compensation for your efforts with F-Street? / A: Correct.
Q: So there would be a $15,000 deposit in your bank account? / A: Correct.

meeting of creditors. In Schedule A/B, the debtors added Mrs. Aydt's potential personal injury claim and Mr. Aydt's contingent commission. UST Ex. 1, at 75. In the SOFA, they added the sale of the two 1997 Land Rovers in 2018. *Id.* at 67.

No other changes were made to Schedule A/B or the SOFA—including changes to Aydt's reported bank accounts, income, or interest in an LLC. According to Reitz, this was partly due to a miscommunication: Aydt had asked Reitz if "everything that the Trustee wants" was in the amendments, and Reitz, believing Aydt was referring to the Chapter 7 panel trustee, said they included everything on the list the trustee provided. Reitz later realized that Aydt had been inquiring about information the UST wanted. Aydt admitted at trial that he did not review the amendments "that well" before signing and filing them with the Court.

### DISCUSSION

Because the denial of a debtor's discharge is an "extreme remedy," exceptions to discharge must be construed liberally in favor of the debtor. *Neary v. McCarthy (In re McCarthy)*, 418 B.R. 745, 752 (Bankr. E.D. Wis. 2009); *see also Stamat v. Neary (In re Stamat)*, 635 F.3d 974, 979 (7th Cir. 2011). At the same time, however, discharge is a privilege, not a right, and is reserved for the "honest but unfortunate debtor." *Stamat*, 635 F.3d at 978. The UST bears the burden of proving grounds for denial of discharge by a preponderance of the evidence. *In re Chlad*, 922 F.3d 856, 860 (7th Cir. 2019).

### A.    11 U.S.C. § 727(a)(4)(A)

The UST's first challenge to Aydt's discharge falls under 11 U.S.C. § 727(a)(4)(A), which allows the Court to deny a discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." To establish grounds for a denial of discharge under § 727(a)(4)(A), the moving party must prove that:

(1) the debtor made a statement under oath;

(2) the statement was false;

(3) the debtor knew the statement was false;

(4) the debtor made the statement with intent to defraud; and

(5) the statement related to the bankruptcy case in a material way.

*Pansier v. Layng (In re Pansier)*, 613 B.R. 119, 159 (Bankr. E.D. Wis. 2020), *appeal dismissed sub nom. Pansier v. Layng*, No. 20-C-221, 2020 WL 1492984 (E.D. Wis. Mar. 27, 2020) (citing *Stamat*, 635 F.3d at 978).

A false oath may consist of (1) a false statement or omission in the debtor's schedules; or (2) a false statement by the debtor at an examination during the course of the proceedings (such as a section 341 creditors meeting or a Rule 2004 examination). *See id.* at 160. When a false statement is in the form of an omission, it is made "knowingly" if the debtor has actual knowledge of the underlying information that was omitted. *See In re Chlad*, 922 F.3d at 862 ("[W]e do not read § 727(a)(4)'s knowledge requirement . . . as necessitating an awareness of a legal obligation to disclose particular information. [The debtor's] actual knowledge of the omitted information itself suffices to fulfill this element.").

As for the element of intent:

Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression. . . . [N]ot caring whether some representation is true or false—the state of mind known as "reckless disregard"—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material.

*In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (internal citations omitted). To establish an intent to defraud, "[t]he plaintiff must prove the omissions are the fruit of an intent to deceive or form a pattern of reckless indifference to the truth." *Layng v. Sgambati (In re Sgambati)*, 584 B.R. 865, 871 (Bankr. E.D. Wis. 2018). The intent determination often depends upon the court's assessment of the debtor's credibility. *In re Kempff*, 847 F.3d 444, 449 (7th Cir. 2017). "A debtor's honest confusion or lack of understanding may weigh against a finding of fraudulent intent." *In re Sgambati*, 584 B.R. at 871.

In evaluating a debtor's intent, courts should look at the "whole pattern of conduct." *Id.* (internal quotation marks omitted); *see also Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 759 (Bankr. N.D. Ill. 2005) ("Because direct evidence of intent is rarely available . . . intent may be inferred from circumstantial evidence, including the debtor's conduct and the petition and schedules themselves."). While "[n]ot every single asset needs to be scheduled and valued, . . . there is a point at which the cumulative errors and omissions cross a line and a debtor's discharge should be denied." *Sgambati*, 584 B.R. at 871; *see also Chlad*, 922 F.3d at 862 ("A finding of fraudulent intent is proper, where, in light of a 'larger picture of omissions and errors . . . the totality of the [debtor's] omissions and errors rises above mere negligence to the level of reckless disregard for the truth.'") (quoting *Stamat*, 635 F.3d at 982); *cf. Sgambati*, 584 B.R. at 872 ("A small number of initial omissions may not warrant denial of discharge, where there is no evidence of intent to defraud, or no pattern of omission.").

Finally, a statement is "material" if it "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat*, 635 F.3d at 982 (internal quotation marks omitted); *see also Chlad*, 922 F.3d at 863–64 (rejecting the debtor's argument that the omitted information was immaterial because it was insignificant or related to assets worth nothing to the estate, and emphasizing that debtors "have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate") (internal quotation marks omitted). A false oath may be material even if it does not result in any harm or prejudice to creditors. *Baccala Realty, Inc., v. Fink (In re Fink)*, 351 B.R. 511, 529 (Bankr. N.D. Ill. 2006).

Aydt's alleged false oaths in this case fall into three main categories: (1) undisclosed income and business connections; (2) undisclosed bank accounts; and (3) undisclosed sales of vehicles. The Court first considers

whether the statements at issue are false—a point on which the parties disagree, at least in part.

**1.    Falsity**

**a.    Undisclosed income and business connections**

The UST identifies several false statements that Aydt made about his business connections and income, both affirmatively and by way of omission. Aydt does not dispute that a number of these statements are false. For example:

- Aydt concedes that he was required to, but did not, disclose his interest in River Birch Capital, LLC, both in his original Schedule A/B and SOFA filed on January 30, 2021, and in the amendments filed in February 2021;
- Aydt agrees that he did not accurately disclose the amount of income he received from Golant in 2017 in response to SOFA question 4; and
- Aydt admits that his testimony at his Rule 2004 examination that he received only $15,000 from Golant was false.

As for the UST's remaining allegation that Aydt made a false oath in failing to disclose the income he received from the sale of the 2017 Range Rover he recovered in California, Aydt counters that the statement (or omission) is not, in fact, false, because the funds were not income to him. This position appears to be based on an erroneous characterization of his agreement with his brother Robert. In post-trial briefing, Aydt argues that "the funds received were not income to Aydt, it was a liability that Aydt *did* disclose," referring to Robert's mortgage, and describing the sales proceeds as the underlying consideration, and a "loan" from Robert. *See* ECF No. 48, at 19. This description conflicts with the chronology and the language of the parties' agreement, which specifies the consideration Robert exchanged to receive the mortgage (assisting in the sale of, and relinquishing his rights in the proceeds of, two specific vehicles—after having financed the purchases of a Range Rover and Mercedes by borrowing funds from Bank of America, and providing the vehicles to Aydt/Golant to resell—and consenting in the payment of those sale proceeds to F Street to reduce the balance due under Aydt's F Street debt). Nor

does Aydt explain how his brother had any legal interest in the sale proceeds of a car that Robert did not own or purchase, such that he could "loan" the proceeds to Aydt.[22]

Aydt did not use the 2017 Range Rover sale proceeds to decrease his debt to F Street *or* to reduce his debt to Robert. Instead, he deposited the money in his home equity account and used it for his own personal expenses. Aydt did not pay for the Range Rover or otherwise provide any consideration to the titleholder in exchange for the vehicle. In these circumstances, the Court cannot consider the sale proceeds to be a loan, but instead they were income to Aydt. The portion of the sale price that Aydt received in 2018—$51,625.77—therefore should have been disclosed in response to SOFA question 5, which asks whether Aydt received "any other income" within the two calendar years prior to filing.

### b.    Undisclosed bank accounts

The UST charges Aydt with making additional false statements on his schedules and SOFA by failing to accurately disclose (1) his current bank accounts (on Schedule A/B) and (2) bank accounts closed within a year of filing (in response to SOFA question 20).

Regarding the first subcategory of omissions, the UST says that Aydt's disclosure on Schedule A/B is wrong as to the number and type of Chase accounts (one checking and one savings, rather than two checking), as well as the total amount held in the accounts as of the petition date. Aydt disagrees that he disclosed only one checking account but does not contest the claims that the disclosures of a savings account and the total held in his Chase

---

[22] Aydt describes his recovery of the Range Rover as being "in the interest of" Robert, *see, e.g.*, UST Ex. 7, at 5, but fails to corroborate this description with any admissible evidence. For example, in his post-trial brief, Aydt asserts of the recovered Range Rover: "[A]n arrangement was struck between the vehicles' [sic] title holder (an apparent straw buyer of Golant's), Robert, and Aydt where the title holder would sell the vehicle but provide the sale proceeds to Robert. The apparent idea was that Robert paid for a vehicle but did not possess it, while the straw buyer did not pay for the vehicle but did possess it." ECF No. 46, at 7 and n.8. Aydt does not point to any evidence in the record to support this characterization.

accounts as of the petition date were inaccurate (the latter by at least a few hundred dollars).

Aydt offers no explanation or argument concerning his failure to disclose on his SOFA the two Chase accounts closed in October 2019, either in his original filing, or when he amended his SOFA in February 2021.

In post-trial briefing, the UST identifies a third subcategory of undisclosed bank information, pointing to Aydt's failure to disclose and produce documentation related to his Securant bank accounts in response to the Court's Rule 2004 order. But a failure to provide documents, absent a corresponding representation about the accuracy or completeness of the production, cannot be characterized as a false statement made under oath sufficient to sustain a cause of action under section 727(a)(4). The Court can, however, take this omission into account as part of Aydt's "whole pattern of conduct."[23]

### c.    Undisclosed sales of vehicles

As a final category of omissions, the UST asserts that Aydt made false oaths within the meaning of § 727(a)(4)(a) by failing to disclose the sale of two 1997 Range Rovers in September and October of 2018 on his original SOFA (question 18), and by failing to disclose at all the $45,000 in income he received from the March 2017 sale of a Range Rover (SOFA question 5).

Aydt does not dispute that he was required to, but did not initially, disclose the sales of the two Range Rovers in 2018 in response to SOFA question 18, and that his omission therefore was false. He does, however, contest whether he was required to disclose the March 2017 vehicle sales proceeds. SOFA question 5 asks for disclosure of any other income received

---

[23] Aydt excuses his failure to produce statements for the River Birch account at Securant Bank by pointing to its minimal account activity: only two deposits, totaling $19,100, were made into the account—$100 upon opening, and $19,000 on April 25, 2017, from Reliable Car Source. Of that amount, Aydt transferred $18,000 to his personal checking account at Chase (Chase Account *0549) in two transactions in May 2017, and the remaining balance he transferred upon closing the account in February 2018. Aydt rationalizes: "Importantly, the Chase Account statements were provided, so there is no money that Aydt hid intentionally or otherwise related to the Securant Account ending *4785."

"during this year or the two previous two calendar years." Aydt is correct that, by its plain terms, question 5 required him to disclose income received from January 1, 2020 through January 30, 2020; during calendar year 2019; and during calendar year 2018. For this reason, Aydt's omission of 2017 income in response to the question—even though he responded to SOFA question 4, which contains the same temporal requirements, by disclosing income for calendar years 2019, 2018, and 2017—cannot be deemed false.

### 2.    Materiality

Aydt's omissions identified above—his interest in River Birch Capital, LLC; extent of income received from Golant; 2018 income received from the 2017 sale of the 2017 Range Rover recovered in California; bank accounts held as of the petition date and closed within a year of filing; and the sale of two 1997 Range Rovers in 2018—were not trivial. His failures to accurately disclose interests he held on the petition date, as well as his prepetition financial transactions, were material to the bankruptcy. *See In re Hansen*, 325 B.R. at 758 ("[A]ll of the statements [the debtor] made in his petition and schedules relating to his assets, property, and financial affairs were material to the bankruptcy."); *Netherton v. Baker (In re Baker),* 205 B.R. 125, 133 (Bankr. N.D. Ill. 1997) ("A matter is material if it is pertinent to the discovery of assets, past transactions, or the debtor's entitlement to discharge.").[24] Whether the statements were made knowingly and intentionally, however, is a closer call.

### 3.    Fraudulent Intent

To the extent Aydt acknowledges his various misstatements and omissions, he argues that they do not run afoul of section 727(a)(4)(A) because he did not make them knowingly and intentionally.

First, Aydt attributes his omission of his interest in River Birch Capital on Schedule A/B and his SOFA to his bankruptcy counsel. That blame must

---

[24] Accurate reporting of disposable income on a Chapter 7 Schedule J, for example, allows the UST to consider whether (in combination with other factors) the income reported is high enough to warrant a motion to dismiss or convert to Chapter 13, for the benefit of unsecured creditors. S*ee* 11 U.S.C. § 707(b)(3); *In re Nockerts,* 357 B.R. 497, 506–08 (Bankr. E.D. Wis. 2006); *In re Kruse*, 545 B.R. 581, 589 (Bankr. W.D. Wis. 2016).

be measured against the debtor's own duties. For instance, in *Neary v. Happel (In re Happel)*, 394 B.R. 915, 920 (Bankr. E.D. Wis. 2008), the court cautioned that the debtor "had a duty to be more careful in reviewing her bankruptcy petition, schedules, and Statement of Financial Affairs before she signed them but failed to do so. Reliance on counsel in completing the statement of financial affairs and schedules is [a] defense to material misrepresentations [only if] such reliance was reasonable and in good faith." Another example is *Spohn v. Carney (In re Carney)*, 558 B.R. 250, 261–62 (Bankr. N.D. Ill. 2016). There, an unsophisticated debtor had disclosed his interest in a corporation (tavern) to his counsel, and relied on his lawyer to determine how and where to list that business interest in his schedules. The business was not disclosed in his Schedule B or SOFA, although some of the information was disclosed elsewhere. *See id.* at 262 (finding that the debtor did not act with reckless indifference "where it is uncontroverted that the hapless Debtor sought and obtained the services of counsel while attempting to prepare his bankruptcy schedules").

In contrast, Aydt is a person with at least some experience in reviewing business contracts. He either did not proofread his filings or he made unquestioning assumptions about information—of which Aydt had actual knowledge, *see Chlad*, 922 F.3d at 862—that his counsel omitted. Therefore his failure to ensure the accuracy of the schedules and statements prepared by counsel both before he filed his petition, and again when he filed his amendments in February 2021 (after the UST initiated this adversary proceeding), was not reasonable. Aydt, not his lawyer, is responsible for the accuracy of his schedules. *See Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 746 (Bankr. N.D. Ill. 2004) ("When a debtor has declared under penalty of perjury that he has read his petition and schedules and that they are true and correct, the debtor—not his lawyer—is accountable for any errors and omissions."); *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 363 (Bankr. N.D. Ill. 2002) ("The Debtors cannot rely on the advice of counsel defense regarding errors in the Schedules and Statement of Financial Affairs where the Debtors

have declared under penalty of perjury that they have read the documents, and to the best of their knowledge, the documents were true and correct.").

As for the inaccurate disclosure of income in response to SOFA question 4, Aydt reported his gross income from operating a business using the "net" income figure from Schedule C of his tax return, rather than his gross receipts, on the advice of bankruptcy counsel. While the Court has concerns about this approach to disclosing gross business income,[25] Aydt is not an accountant or tax professional, nor is he experienced in bankruptcy law. In the circumstances, his reliance on his attorney in disclosing his (alleged) net business income, rather than gross business income, was reasonable. Aydt also testified credibly that he disclosed the receipt of $47,000 of business income in 2017 to his accountant. His testimony that he was not aware his accountant had reported the income incorrectly on his federal tax returns until after he filed his bankruptcy petition is less credible, given the size of the error. But without more, Aydt's failure to accurately disclose his 2017 gross business

---

[25] *See, e.g.*, *Happel*, 394 B.R. at 920 ("[The debtor] was required to disclose in Question # 1 [now Question 4 of the SOFA] the gross amount of all income she received from her business operations with Lock, even if the business was operated at a loss. The disclosure which she made in Question # 1 is woefully incomplete. It failed to include any rentals received from tenants at the various properties purchased."); *In re Stamat*, 395 B.R. 59, 71–72 (Bankr. N.D. Ill. 2008) (Reading former SOFA Question 1—"State the gross amount of income the debtor has received from employment, trade, or profession, or from operation the debtor's business, including part-time activities either as an employee or in independent trade or business . . . ."—to require the debtors to disclose the gross income of each of their two wholly-owned LLCs reflected on each Schedule C of their tax return, and not the net "profit" for each LLC identified on Schedule C, nor the net profit/loss of the two LLCs combined reflected on line 12 of Form 1040: "Defendants' characterization of a limited liability company as a separate legal entity is a correct statement of state corporate law for purposes of liability, but is irrelevant for purposes of federal taxation and determining gross income. . . . [T]he $20,559 that Defendants argue was their *gross* income from operation of business is really the *net* amount of the *net* profit/loss of both limited liability companies controlled by Defendants . . . . Line 12 of Form 1040, which is labeled Business Income (or Loss), does not measure gross income, but is the net amount of two net amounts.") (emphasis in original); *aff'd sub nom. Neary v. Stamat*, No. 07 B 13379, 2009 WL 2916834, at *5 (N.D. Ill. Sept. 2, 2009) (declining to resolve the meaning of Question 1 of the SOFA, because even if the debtors were correct that they were required to report only the net profit received from the LLCs, the amount they reported on their bankruptcy petition was substantially different from the actual amount they reported on their tax return), *aff'd*, 635 F.3d 974, 982 (7th Cir. 2011) (like the district court, declining to resolve the dispute over what former Question 1 of the SOFA specifically requires, because even if Question 1 required the debtors to report only their own personal profit, the amount they reported was incorrect).

income in response to SOFA question 4 is not indicative of an intent to deceive. For the same reason, Aydt's Rule 2004 testimony—in which he indicated his belief that he received only $15,000 from Golant, and referred to his 2017 tax returns—does not manifest fraudulent intent.

Aydt's nondisclosure of the income he received from the 2017 sale of the car he recovered in California "in the interest of" Robert is still less defensible. There is no evidence that Aydt informed his bankruptcy attorney of the sale of that vehicle, or of the resulting proceeds that he received, before he filed for bankruptcy—and therefore his erroneous belief about the proceeds being a "loan," rather than income, and his resulting failure to disclose that income, is not attributable to his reliance on counsel. On the other hand, the record also does not compel the conclusion that Aydt deliberately withheld the information for the purpose of deceiving creditors, or with some other nefarious motive.

The same is true of Aydt's inaccurate disclosure of his existing and recently-closed bank accounts on Schedule A/B and the SOFA. Aydt argues that he did not withhold or omit any information intentionally and points out that he provided the UST with bank statements for the two Chase accounts he held as of the petition date, as well as the two Chase accounts closed in October 2019, in response to the Rule 2004 requests. He adds that he had little motive to withhold the information, given that the amount of money in his bank accounts as of the petition date was far exceeded by his liabilities. And, assuming the amount of money in his Chase accounts was understated by only a few hundred dollars—the UST has provided no evidence to establish a larger misstatement—the total amount in the accounts still fell within the limits of the Wisconsin exemption for depository accounts, meaning the cash did not represent an undisclosed asset that could be used to pay creditors.

Finally, Aydt asserts that his initial failure to disclose on the SOFA the sale of two 1997 Range Rovers in 2018 was innocent. He reminds that he disclosed the transfers to his bankruptcy attorney before filing his petition, as well as the Chapter 7 trustee at his May 2020 meeting of creditors, and that he amended his SOFA (in February 2021) to include the transfers. The UST

counters that Aydt's amendment to the SOFA does not excuse his original false statements, citing *Mazer v. United States*, 298 F.2d 579, 582 (7th Cir. 1962) (rejecting debtor's argument that an amended schedule relieved a false oath).

The UST is correct that a debtor cannot cure a false oath by making subsequent corrections to his bankruptcy statements and schedules. *See Sgambati*, 584 B.R. at 872 (citing *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 900 (Bankr. N.D. Ill. 2003) ("Allowing a debtor to submit false schedules and then, on discovery, avoid the negative consequences of his dishonesty by amending those schedules 'is contrary to the spirit of the law which aims to relieve honest debtors only.'")). In addition, while a debtor's voluntary amendment and disclosure of omitted material may be evidence of innocent intent, courts are less likely to infer innocent intent if the debtor makes amendments only after an omission is brought to light by an interested party. *See In re Fink*, 351 B.R. at 527 (that the debtor made amendments to his schedules only after a creditor filed a complaint seeking denial of discharge "demonstrates that full and honest disclosure was not important to this Debtor"). Aydt's unexplained eight-month wait to amend his SOFA to include the vehicle transfers is troubling. But, in the circumstances, including his disclosure of the vehicle sales to the Chapter 7 trustee as early as his May 2020 section 341 meeting of creditors, Aydt's omission on his original SOFA of the two vehicle sales does not appear to be the fruit of an intent to deceive. The fact that he described those sales to his bankruptcy counsel before reviewing his schedules also supports a lack of intent to deceive, but leaves unanswered why, as with the failure to state that he had an LLC, *see supra* Section H.1.b, Aydt did not question the omission before signing under penalty of perjury.

In sum, the Court cannot find that Aydt made any of the various omissions and misstatements described above with *actual* intent to defraud. The question remains, however, whether all of the false statements, taken together, cross the line into reckless disregard for the truth, which the Bankruptcy Code treats as the functional equivalent of fraud. Here, the Court

must evaluate "the circumstances as a whole and the pattern of omissions engaged in by the debtor," rather than consider each false statement on its own. *See In re Chlad*, 922 F.3d at 862–63 ("Chlad may be right that some of her omissions—if viewed in isolation—may reflect mistakes. . . . By focusing on isolated omissions, Chlad suggests a reason why each piece of information was omitted. But Chlad's patchwork reasoning asks us to ignore the broader pattern clear from the trial evidence: that Chlad made a series of false statements about information of which she was aware."); *In re Olbur*, 314 B.R. at 745–46 (although the debtors' various omissions and misstatements, when considered separately, "may not have been particularly serious misstatements" and "[p]robably none would warrant a denial of discharge on its own," when viewed together, the cumulative errors and omissions painted a picture of "actual dishonesty" warranting denial of discharge).

As shown above, in making some of his inaccurate statements, Aydt relied on his bankruptcy counsel, and at least for the 2017 income, on the tax returns prepared by his CPA. The performance and testimony of bankruptcy counsel is troubling in several aspects. The failure to disclose River Birch Capital, LLC, *twice*, despite the fact that Aydt had mentioned it as shown by Mr. Reitz's own notes,[26] is an error that should not have occurred. (This is so even though the Chapter 7 trustee did not ask for that specific amendment at the § 341 meeting of creditors.) Aydt also had told his bankruptcy counsel about his 2018 sale of two 1997 Range Rovers prepetition and described the sales to the trustee at his § 341 meeting. Whenever counsel and his client take an opportunity to amend schedules or statements, diligent care should be taken to ensure accuracy. Failing to identify the number of bank accounts (at Chase Bank) and understating the balances by at least several hundred dollars is sloppy. The eight-month delay in amending schedules was not explained. Counsel was aware that not only the Chapter 7 trustee but also the UST had

---

[26] Mr. Reitz acknowledged that he reviewed the debtor's 2017 tax return before completing the petition and schedules. Schedule C of that return included the name of River Birch Capital, LLC. *See* ECF No. 40, at 131–32.

asked his client for more information. Being mindful of Code requirements for full disclosure, as well as being aware of the magnitude of the damages sought against Aydt in the pending state court litigation, counsel should have better appreciated the level of scrutiny which would be afforded all of his client's filings. His view that only net income, instead of gross income, need be reported is also questionable. These omissions and characterizations rest in large part in the lap of Aydt's counsel, not least because Aydt gave his counsel all this information originally. *See, e.g., Richardson v. Swisher (In re Swisher)*, No. 17-70310, 2017 WL 5634594, at *4 n.1 (Bankr. C.D. Ill. Nov. 22, 2017) (debtor's disclosure on one schedule seemingly conflicted with information provided elsewhere, suggesting her bankruptcy counsel did not fully investigate debtor's affairs as required by 11 U.S.C. § 707(b)(4)(C)).

On the other hand, Aydt is not blameless for failing to thoroughly review his filings before signing them. *See Happel*, 394 B.R. at 920. If he had taken the requisite care in doing so, he could have ensured that his original, or at least amended, schedules and SOFA correctly and completely disclosed all business interests, bank accounts (both open and recently-closed), and income.[27]

The other primary inaccuracy—failing to disclose the 2018 receipt of proceeds from a 2017 sale of a Range Rover ($51,625.77)—is attributable not only to Aydt's lawyer's inattention to the number of vehicles sold,[28] but some faulty memory of dates and Aydt's decision not to use the sale proceeds to repay his brother but to deposit them in his home equity account.

---

[27] The record contains other evidence of carelessness or inattention to detail. For example, Aydt's initial discovery responses incorrectly stated that a $10,000 deposit he received in June 2017 was a draw against commission owed by Golant, but he later amended that response to clarify the deposit was a withdrawal from his 401k account. Aydt also failed to disclose his ownership of a firearm on his schedules, despite owning a gun.

[28] At least by the § 341 meeting, Mr. Reitz did not appear to know the number of vehicles Aydt had sold personally. *See also supra* Section H.1.c (describing Reitz's later testimony that he had discussed some vehicle sales with Aydt, but could not identify any particular vehicles: "There were always Land Rovers so I don't know which specific one.").

The Court considers whether these inaccuracies manifest a pattern of recklessness warranting withholding of discharge. While the Court assesses the instant facts against the Code text, other cases involving claims of "false oaths" under section 727(a)(4)(A) provide helpful comparisons. For example, the debtor in *In re Sgambati*, 584 B.R. at 885, failed to disclose all income derived from his business, including failing to identify personal expenses paid by the business or with a "business" credit card, failing to list certain debts in his schedules, and failing to disclose the gift or transfer of a $6,750 engagement ring purchased with a credit card. The Court concluded that those omissions were material, part of a pattern, and demonstrated reckless disregard for the truth sufficient to deny discharge. In *In re Chlad*, 922 F.3d at 862–63, the appeals court held that the bankruptcy court did not clearly err in finding that a Chapter 7 debtor acted with fraudulent intent based on her failure to disclose (1) real estate in which she had a joint interest, (2) a significant creditor to whom she owed more than $800,000, (3) a shareholder loan of over $1 million that she had received, (4) jointly owned bank accounts, (5) other sources of income, and (6) an alternate name she had used. The sheer number and pattern of omissions, coupled with evidence of the active role that debtor played in investigating her financial affairs, supported a finding that debtor acted with at least reckless indifference for the truth.

Similarly, in *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 248–49 (Bankr. N.D. Ill. 2005), the debtor failed to disclose his interest in real property, two automobiles, a $90,000 transfer to his wife during the year before he filed his petition, and large gifts to family members made within the year before filing. The court considered that those omissions not only were of recent transactions but were "simply too substantial to overlook or attribute to mere negligence or inadvertence" of the debtor and suggested fraudulent intent. *Id.* And in *In re Olbur*, 314 B.R. at 745–46, the debtor failed to disclose ownership of stock certificates or a safe deposit box, his or his wife's monthly income, *any* monthly expenses, and creditors who had recently obtained a judgment against him or the corresponding debt, and he also identified two of

his businesses as either still operating or having recently ceased operations, when they had gone out of business years earlier. Those inaccuracies, according to the *Olbur* court, when viewed together, painted a picture of "actual dishonesty" warranting denial of discharge. *Id.*

Several other courts evaluated the quantum and quality of omissions and concluded that discharge should be denied. In *In re Bostrom*, 286 B.R. at 363, the debtors failed to disclose three parcels of real property in Florida, a fur coat, three television sets, a stereo system, and substantial income. These omissions of assets, items not likely to be missed inadvertently, were too pervasive to be attributed to mere negligence and constituted grounds for denial of their discharge. Likewise, in *A.V. Reilly Int'l, Ltd. v. Rosenzweig (In re Rosenzweig),* 237 B.R. 453, 457 (Bankr. N.D. Ill. 1999), the court regarded the debtor's failures to disclose an unsecured family loan in the amount of $25,000, an income tax refund, a second computer, and the fact that the debtor's home had only recently been transferred into tenancy by the entireties were sufficient, in the aggregate, to warrant denial of discharge. In *Netherton v. Baker (In re Baker),* 205 B.R. 125, 133 (Bankr. N.D. Ill. 1997), the court viewed the debtor's failure to disclose his tropical fish hobby and its assets, including over 100 fish tanks which took up his entire basement, in either his schedules or at his creditors meeting, as grounds for denial of his discharge.

Other courts have confronted allegations of false oath where the omissions or mischaracterizations concerned less-substantial assets or honest misunderstandings. For instance, in *In re Carney*, 558 B.R. at 261–62, the court assessed the debtor's failure to list (1) assets in Schedule B and/or the SOFA, including his ownership of a corporation through which he operated a bar, the liquor license in his name, and certain trade names, (2) his out-of-pocket payments for the expenses of the bar in his Schedule J, and (3) the gross receipts of the bar during the 34-day period it operated as a sole proprietorship as gross income on the SOFA, not as the product of fraudulent intent but instead as honest mistakes by an unsophisticated businessperson. The court found it significant that the debtor had disclosed key information in

other portions of his schedules, had informed the trustee and creditors about his company at the meeting of creditors, and had informed his lawyer of his business and corporation and relied on his lawyer in determining how and where to disclose that interest.

Another court assessed the evidence of erroneous value entries and declined to deny a discharge. In *Farley v. Kempff*, 538 B.R. 431, 444 (N.D. Ill. 2015), *aff'd sub nom. In re Kempff*, 847 F.3d 444 (7th Cir. 2017), the district court agreed with the bankruptcy court that the Chapter 7 debtor did not engage in a pattern of intentional and reckless conduct where she had incorrectly estimated the value of gifts she received from her parents as income on Schedule I and had made that estimate, even if negligently, after consulting with her counsel. Moreover, her failure to amend her bankruptcy schedules to reflect the correct value did not suggest fraudulent intent because the gifts were not assets available to creditors; this lack of fraudulent intent was supported by the fact that the debtor amended her schedules to disclose her divorce settlement, and an error in the debtor's Statement of Financial Affairs was merely a typographical error.

Aydt's pattern of omissions is more similar to the examples constituting reckless disregard, and the quantity of errors surpasses the threshold of mere negligence. First, as noted above, while Aydt relied on his bankruptcy counsel to some extent for accurate completion of his schedules, that reliance does not absolve him of a duty to carefully review his statements before signing them under penalty of perjury. A reliance on legal advice, such as where to put information about corporation ownership, s*ee, e.g. Carney*, 558 B.R. at 262, may be reasonable. But a "reliance" on having mentioned banking accounts or corporate entities to counsel and nonetheless not finding those known facts reported in the schedules nor questioning their absence, is not reasonable.

Similarly, Aydt's "reliance" on his tax returns finalized by a CPA to testify to only $15,000 received from Golant in 2017, when the actual amount was more than three times that amount, is not reasonable. (Aydt's confidence in reporting that he only received $15,000 from Golant between January and

April 2017 should have been undercut by the impatience he showed as early as October 2016 in not receiving compensation from Golant, and the fact that he generated virtually no other wage income to live on in 2017.)

Aydt's omission of the $51,625.77 in proceeds received from the sale of a Range Rover using his power of attorney, because the money briefly sat in his home equity account, is not reasonable. He used those funds like a checking account to pay personal expenses. The notion that those funds on deposit further "secured" his brother's second mortgage is illusory, given Aydt's prompt turnaround in using them for personal expenses. Those car sale proceeds were not monies his brother lent him in exchange for a second mortgage. Whether or not Aydt described this "consideration" rationale to his bankruptcy lawyer (let alone the sale of the vehicle and receipt of the sale proceeds)—and significantly, his lawyer offered no testimony about it—Aydt himself knew that those Range Rover proceeds had no tie to the arrangement he made with his brother. *See* ECF No. 39, at 131–33 ("Q: Mr. Aydt, we had just moments talked about a vehicle, a Range Rover that you recovered in California and it sold to a dealership in California for $106,636. Do you recall that? A: Yes. Q: Okay. And, at the time, why were you recovering that vehicle and why did you sell the vehicle on behalf of your brother? A: Well, I mean, I don't know that it was sold on behalf of my brother. . . . Q: Okay. Did you have power of attorney to sell the vehicle? A: Yes. Q. Okay. And you then deposited the proceeds into your own bank account. Is that right? A: Deposited in—into my home equity line. . . . Q: And did you use the HELOC loan for your personal expenses? A: Yes. Q: Did you pay for the vehicle that you sold for $106,000? A. No.").

Aydt's other omissions are not of the same dollar value as the 2017 Golant payment error or the 2018 Range Rover proceeds, but they are symptomatic of a pattern of reckless disregard for accurate disclosure. Aydt should have paid attention to whether all of his bank accounts were disclosed—their existence was not remote in time so as to be forgotten, nor was their number overwhelming. Aydt should have paid attention to whether his interest in River Birch Capital, LLC, was disclosed—both at the time of filing

and the time of amendment. The two vehicle sales he included in his belated amendment should have been disclosed originally, if he had taken the time to consider their date of sale. His initial characterization, during discovery, of a $10,000 deposit in June 2017 as part of his "draw" from Golant, instead of its true source as a cash-out from his retirement account, is not on its own an act of reckless disregard, but its mischaracterization is part of Aydt's pattern of failing to take his bankruptcy case seriously, and ultimately provoking substantial discovery efforts by the UST to obtain a clearer picture of his financial affairs. Aydt and his counsel never explained why it took eight months to amend his schedules. Aydt never explained why he did not provide the purchase orders and proofs of vehicle sales he received from Golant to the UST in response to the Rule 2004 examination requests, instead waiting until adversary discovery.

In sum, Aydt's false and belated disclosures evidence a reckless disregard for the truth. The UST therefore has met his burden of demonstrating that Aydt acted with the requisite fraudulent intent to warrant a denial of discharge under 11 U.S.C. § 727(a)(4)(A).

**B.    11 U.S.C. § 727(a)(5)**

As his second cause of action, the UST asserts that the Court should deny Aydt's discharge under 11 U.S.C. § 727(a)(5), which provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liability." § 727(a)(5).

Section 727(a)(5) gives courts "broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *First Federated Life Insurance Co. v. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir. 1983).

There are two stages of proof with respect to § 727(a)(5):

First, the party objecting to discharge has the burden of proving that debtor at one time "owned substantial and identifiable assets that are no longer available to his creditors." . . . Second, if the

party objecting to the discharge meets its burden, then the debtor
"is obligated to provide a satisfactory explanation for the loss."

*Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 955 (Bankr. N.D. Ill. 1995).

What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the Court. *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir. 1966). A satisfactory explanation does not mean a satisfactory result: "courts are not concerned with the wisdom of a debtor's disposition of assets and income but instead focus[] upon the truth of the debtor's explanation." *In re McCarthy*, 418 B.R. at 754. Although the explanation need not be comprehensive, it must meet two criteria to be deemed "satisfactory." *In re Bryson*, 187 B.R. at 956. First, it must be "good enough to eliminate the need for the Court to speculate as to what happened to all the assets." *Id.* Second, it must be supported by some documentation (documentation "sufficient . . . to free the Court from the need to speculate about the veracity of the debtor's explanations"). *Id.* In other words, the explanation "must consist of more than . . . vague, indefinite, and uncorroborated" assertions, *Baum*, 359 F.2d at 814, and instead "must be a good faith explanation of what really happened to the assets in question." *Olson v. Potter (In re Potter)*, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988). A debtor "cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation." *In re Martin*, 698 F.2d at 888.

To meet his initial burden of proving that Aydt at one time owned substantial and identifiable assets that are no longer available to his creditors—the $1.5 million in missing loan proceeds—the UST asserts that a debtor "may be found to have a cognizable ownership interest in loan proceeds," citing *In re McDonald*, 614 B.R. 801, 813 (Bankr. N.D. Ohio 2020); *In re Hermanson*, 273 B.R. 538, 548 (Bankr. N.D. Ill. 2002); and *In re Mezvinsky*, 265 B.R. 681, 696 (Bankr. E.D. Pa. 2001). Aydt counters that these cases are inapposite and do not prove that "having your name appear on a promissory note equates to owning a cognizable interest in the asset."

In *McDonald*, *Hermanson*, and *Mezvinsky*, each of the debtors personally received, was able to control, and used the loan proceeds at issue. Aydt, in contrast, testified that he never had actual or constructive possession of the funds F Street loaned to Golant (other than the payments he received from Golant as "commission," which may or may not have constituted proceeds of the F Street loans). The UST offered no contrary evidence. On this record, the Court cannot find that Aydt had a cognizable ownership interest in the $1.5 million, at least not to the extent that Aydt was capable of using the funds to pay his creditors.

Even assuming that Aydt had an ownership interest in the loan proceeds by virtue of his liability on the promissory notes, the loss of assets is not unexplained. Aydt testified that Golant absconded with (the majority of) the funds. He offered credible evidence in support, and the Court believes Aydt's account of what happened to the $1.5 million in loan proceeds. "That does not mean that anyone should be satisfied with the result of the transfers. . . . [But because Aydt] has been truthful and credible with regard to the disposition of the assets . . . , [he] has not violated the proscribed standard of conduct." *Neary v. Guillet (In re Guillet)*, 398 B.R. 869, 890–91 (Bankr. E.D. Tex. 2008) (victim of fraudulent Nigerian investment scheme did not fail to provide "satisfactory" explanation of what happened to his assets: "Admittedly, the true identity of the perpetrators of this Nigerian scam are probably not known nor are the missing assets likely to be located. The greatest likelihood is that the assets went to fraudulent criminals who plotted and implemented an elaborate scheme to bilk the Debtor out of his money. However, to the extent that such information is unknown, it is unknown to the Debtor as well.").

In so finding, the Court does not give short shrift to the UST's arguments about Aydt's good faith or lack thereof. *See* ECF No. 42, at 13–14 ("*At a minimum*, the Defendant could have produced the Securant and Chase bank statements to disclose that he received at least $19,000 of the $1.5 million loan proceeds. Instead, the Defendant makes a blanket allegation that he cannot explain the disposition of the loan funds because Albert Golant is a felon. . . .

The Defendant's reluctance or inability to provide documentation regarding the disposition of $1.5 million in loan proceeds is undercut by the record before this Court. The Court cannot find that the Defendant has exhibited good faith to explain the loss of his assets.") (emphasis in original). The Court is troubled by Aydt's initial failure to produce the documentation he received from Golant in response to the UST's Rule 2004 request for "[a] detailed accounting sufficient to trace the receipt and disposition of all loan proceeds issued from F-Street Investments LLC to Edward Aydt," based on an over-technical reading of the request as being limited to funds that went directly from F Street into Aydt's bank account. Whether this narrow reading is attributable to Aydt or to his counsel, it is incompatible with Aydt's repeated claims of full disclosure, cooperation, and transparency. Nevertheless, because Aydt did not own the entirety of the $1.5 million in loan proceeds, nor were those funds at his disposal and available to his creditors, the Court concludes his failure to account for the funds does not violate 11 U.S.C. § 727(a)(5).

**C.      11 U.S.C. § 727(a)(3)**

The UST's third and final cause of action seeks denial of Aydt's discharge under 11 U.S.C. § 727(a)(3). That section of the Code provides that a court shall grant a discharge

> unless the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The purpose of § 727(a)(3) is "to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Scott*, 172 F.3d 959, 969 (7th Cir. 1999) (internal quotation marks omitted). The Seventh Circuit has summarized:

> Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy

for a reasonable period past to present." The provision ensures
that trustees and creditors will receive sufficient information to
enable them to "trace the debtor's financial history; to ascertain
the debtor's financial condition; and to reconstruct the debtor's
financial transactions." Records need not be kept in any special
manner, nor is there any rigid standard of perfection in record-
keeping mandated by § 727(a)(3). On the other hand, courts and
creditors should not be required to speculate as to the financial
history or condition of the debtor, nor should they be compelled to
reconstruct the debtor's affairs.

*In re Juzwiak*, 89 F.3d 424, 427–28 (7th Cir. 1996) (internal citations
omitted).

Courts recognize that section 727(a)(3) "places an affirmative duty on
the debtor to create books and records accurately documenting his business
affairs." *In re Scott*, 172 F.3d at 969; *see also In re Juzwiak*, 89 F.3d at 429
("The debtor has the duty to maintain and retain comprehensible records.").
Creditors are not required to accept a debtor's unsubstantiated oral
testimony in lieu of concrete written records, *Juzwiak*, 89 F.3d at 429–30,
or "to risk the withholding or concealment of assets by the bankrupt under
cover of a chaotic or incomplete set of books or records," *Scott*, 172 F.3d at
969 (internal quotation marks omitted).

To prevail under section 727(a)(3), a plaintiff has the initial burden of
proving only that the debtor failed to keep adequate records. *In re Self*, 325
B.R. at 241. Intent is not a required element. *Scott*, 172 F.3d at 969;
*Juzwiak*, 89 F.3d at 430. "The type and quantity of records required to
satisfy the debtor's duty under section 727(a)(3) varies, based on the
circumstances of the case." *In re Pansier*, 613 B.R. at 152. Relevant factors
to consider include the size, complexity and nature of the debtor's business;
the debtor's level of education and sophistication; the debtor's business
experience and acumen; and the debtor's "personal financial structure." *In
re Hansen*, 325 B.R. at 762. Because "[s]ection 727(a)(3) is not designed to
bar the discharge of an ordinary consumer debtor . . . , holes in a consumer
debtor's financial records will not be enough to invoke section 727(a)(3)" in

most cases. *Id.* (citing *Scott*, 172 F.3d at 970 ("[M]ost bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions does not implicate § 727(a)(3).")).

Once a plaintiff satisfies its initial burden to prove that the debtor failed to keep adequate records, the burden shifts to the debtor to justify the lack of records. *In re Self*, 325 B.R. at 242. "A bankruptcy judge has broad discretion to decide whether . . . a debtor's failure to keep records is justified." *Hunt v. O'Neal* (*In re O'Neal*), 436 B.R. 545, 558 (Bankr. N.D. Ill. 2010).

Here, the majority of the records which the UST asserts the debtor has failed to preserve are records of the luxury car-buying business. Because Mr. Golant has been incarcerated, the UST has been unable to examine him about disposition of loan proceeds from F Street. A number of courts have considered that a debtor will not lose his discharge because a business partner bore some or all of the record-keeping responsibility. *See, e.g., D.A.N. Joint Venture v. Cacioli, (In re Cacioli)*, 463 F.3d 229 (2d Cir. 2006) (debtor's failure to maintain business records was justified due to his limited education and reasonable reliance on his business partner for record-keeping and therefore was not grounds for denial of discharge under § 727(a)(3)). Courts also are careful to assess whether a debtor has failed to preserve records related to property of the debtor's estate, as distinct from property owned or held by separate entities. *See, e.g., Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87 (5th Cir. 2016) (debtor was under no obligation to keep or disclose records relating to his wholly-owned construction company); *8400 N.W. Expressway, LLC v. Morgan (In re Morgan)*, 360 B.R. 507 (Bankr. N.D. Tex. 2007) (distinguishing records of debtor's company from debtor's personal financial records).

The UST has not argued that any of Golant's business entities were Aydt's "alter ego." *See, e.g., Patriot Group, LLC v. Fustolo (In re Fustolo)*, 597 B.R. 1 (Bankr. D. Mass. 2019) (distinguishing the "alter ego" argument

raised by creditor as applying to a concealed transfer of property of the estate). The UST does contend that because Aydt knew that he needed to keep records regarding the disposition of loan proceeds from F Street, and did so for a time, he should be denied a discharge for failing to preserve additional records, particularly of the disposition of $1.5 million issued pursuant to a January 1, 2017 promissory note. The UST is critical of Aydt's testimony that he did not preserve paper records but instead relied upon a "fluid spreadsheet located in the cloud."

In contrast, Aydt contends that the sparse records of disposition of the $1.5 million Lurie promissory note proceeds are not records of *Aydt's* own financial history or financial condition. Those latter are not missing—Aydt provided records of the total of $47,000 he received from Reliable Auto Source or Shha LLC (in addition to the $16,800 received from WI Automotive Trust) during the period when he solicited investment from F Street. Those records were introduced at trial. UST Exs. 6–8, 11–13, 17.

Perhaps to bridge the distinction between records of monies Lurie/F Street invested with the Golant entities, versus records of Aydt's own financial history, the UST asserts that Aydt is a highly sophisticated and educated individual. The Seventh Circuit applies a higher level of scrutiny to debtors who were engaged in "significant business transactions involving large sums of money." *Pansier*, 613 B.R. at 152 (citing *In re Scott*, 172 F.3d at 970; *In re Juzwiak*, 89 F.3d at 428). As the UST describes him, Aydt has significant business experience and acumen—having solicited and obtained millions of dollars in investments in furtherance of his business venture. Accordingly, he asks the Court to apply the higher standard of scrutiny as set forth by the Seventh Circuit in *Juzwiak*.

Aydt disagrees. He contends that because he never received or controlled the F Street note proceeds (the focus of the UST's complaint), the facts of this case are not analogous to *Scott* or *Juzwiak*. Therefore, he urges no "heightened" record keeping standard applies. Moreover, Aydt asserts that the UST did not present evidence sufficient to establish that he was Golant's business partner.

Even if he had proven a partnership, "[a] debtor's involvement in a business . . . does not necessarily require the Court to impose the heightened record-keeping standard of *Scott* and *Juwiak*." *Pansier*, 613 B.R. at 153 (whether debtors should be held to a "higher standard" and required to provide documents relating to their trust turned on whether the debtors' income and assets—and thus their overall financial condition—were dependent on the trust). Aydt notes that the F Street debt is tied to Aydt personally only because he signed a guaranty on the note in his personal capacity. The UST has cited no caselaw where a guarantor subsequently was required to produce the underlying business records related to the debt he or she guaranteed.

The Court finds that even if the higher standard of scrutiny is applied to Aydt's record-keeping, he has not failed to keep or preserve records of information he never had. The *Juzwiak* court deemed the debtor's production of checking account records, canceled checks, deposit slips, bank statements and tax returns inadequate to trace his financial transactions, because the debtor "ran a business enterprise engaged in a steady stream of large scale transactions involving substantial sums of money." *Juzwiak*, 89 F.3d at 429. That court noted that section 727(a)(3) places an affirmative duty on a debtor to create books and records accurately documenting his business affairs. *Id.* at 429. The *Juzwiak* debtor actually had kept yearly records of his grain hauling business transactions in a notebook, which he provided to his accountant. But the *Juzwiak* debtor did not produce those notebooks to the bankruptcy trustee. In *Scott*, the debtors had maintained a database of their various transactions, but it became unusable before the trustee could access it. The *Scott* debtors made extensive investments and real estate purchases, at one time controlling more than 70 corporations, partnerships or limited partnerships. They also "substantially disregarded independent corporate forms in managing their cash flow." 172 F.3d at 964. The *Scott* court was critical that "without proper books and records [a debtor] could obtain a discharge while frustrating a trustee's ability to liquidate prepetition assets to satisfy prepetition debts." *Scott*, 172 F.3d at 969.

An Indiana bankruptcy court commented on the high standard these cases impose on a debtor who himself had operated a business enterprise, and then had to file bankruptcy when the business failed. *Buckeye Retirement Props. v. Tauber (In re Tauber)*, 349 B.R. 540, 550 (Bankr. S.D. Ind. 2006). *Tauber* understood the higher standard to be limited in application, as the *Scott* court detailed:

> [W]here debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping. . . . As the debtors in this case lost over $20 million, there might be grounds to question their level of sophistication. But as they solicited the investments made, set up the impenetrable financial maze and *directly controlled both the flow of funds and the investment decisions of the business entities,* we conclude that they should be held to a higher level of scrutiny than an ordinary debtor.

*Tauber*, 349 B.R. at 553 (quoting *Scott*, 172 F.3d at 964) (emphasis added). The *Tauber* court ultimately concluded that the debtor there was not subject to higher scrutiny, because the record-keeping inquiry concerned whether the debtor, a principal in a lender entity, had "squirreled away" some loan proceeds for himself, and not possible disposition of assets of the lender. 349 B.R. at 553. This focus made the inquiry more akin to a consumer debtor case. *Id.*

There are similarities here. The UST's inquiry sought to learn whether Aydt kept any of the F Street loan proceeds for himself. The evidence is that Aydt tried to track the F Street funds and subsequent car purchases via the "fluid spreadsheet," and that effort did not begin only with the last promissory note. The evidence also is that Aydt communicated to Golant his dissatisfaction about the inadequate flow of information, but his requests were not fully met. Aydt is unlike the debtor in *Scott*, as he did not "directly control[] both the flow of funds and the investment decisions of the business entities." His failure to keep and preserve records of the disposition of the $1.5 million proceeds from the last promissory note was justified. Accordingly, the Court finds that the evidence is insufficient to establish a basis to deny Aydt's discharge under 11 U.S.C. § 727(a)(3).

**CONCLUSION**

In sum, the Court will deny debtor Edward Aydt his discharge for reasons having little to do with his association with fraudster Golant, and much more to do with his own inattention, inaccuracy, and delay. For the foregoing reasons, the Court concludes that the UST has proven by a preponderance of the evidence that debtor Edward Aydt's discharge should be denied under 11 U.S.C. § 727(a)(4)(A). The Court will enter a separate order consistent with this decision.

Dated: January 11, 2022

By the Court:

Beth E. Hanan
United States Bankruptcy Judge